UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

ROBERT E. SILVERMAN OLIVERAS,

                                              Plaintiff,

                    -against-

COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                                              Defendant.
---------------------------------------------------------------------X

For Online Publication Only

**ORDER**
23-CV-4011 (JMA)

**FILED**
**CLERK**

2/20/2025 3:21 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Before the Court is an appeal brought pursuant to the Social Security Act, 42 U.S.C. § 405

et seq. (the "SSA").  Plaintiff Robert Silverman Oliveras challenges final determinations by the

Commissioner of the Social Security Administration (the "Commissioner") that he is ineligible to

receive Social Security disability insurance benefits.  (See Compl., ECF No. 1.)  Presently before

the Court are the parties' cross-motions, pursuant to Fed. R. Civ. P. 12(c), for judgment on the

pleadings.  (ECF Nos. 8 & 9.)  Upon consideration of the administrative record and the reasons set

forth herein, the Court DENIES Plaintiff's motion and GRANTS Defendant's cross-motion for

judgment on the pleadings.

## I.        BACKGROUND

On June 6, 2016, Plaintiff applied for disability insurance benefits and supplemental

security income, alleging disability due to Hodgkin's lymphoma and anxiety.  (ECF No. 11,

Administrative Transcript ("Tr.") 41, 135-43, 159.)  Plaintiff's application was denied, and he

requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 58-63, 68-70).  Plaintiff

and his attorney appeared at a hearing before an ALJ on October 3, 2018.  (Tr. 25-40).  By decision

dated October 23, 2018, the ALJ denied Plaintiff's application.  (Tr. 7-26.)

On September 18, 2019, the Appeals Council denied Plaintiff's request for review.  (Tr. 1-6, 127-29).  Plaintiff then commenced a civil action in the United States District Court for the Eastern District of New York ("District Court") seeking judicial review.  (Tr. 438-39); see Oliveras v. Commissioner of Social Security, 19-cv-06462-JS.  By memorandum and order dated March 15, 2021, the District Court remanded the case back to the Commissioner for further proceedings.  (Tr. 448-71).

On remand, the Appeals Council vacated the final decision and remanded the case to the ALJ for further proceedings consistent with the district court's order.  (Tr. 474).  Plaintiff testified at a hearing before the ALJ on February 16, 2022; the ALJ also heard testimony from two medical experts.  (Tr. 370-411).  At a subsequent hearing on February 14, 2023, Plaintiff, a medical expert, and a vocational expert all testified.  (Tr. 412-36).  On February 22, 2023, the ALJ issued a decision finding Plaintiff not disabled.  (Tr. 343-369).  The Appeals Council declined review of the February 22, 2023 decision, so the Administrative Law Judge's decision became final on April 24, 2023, and this action followed.

On May 31, 2023, Plaintiff appealed the final decision of the Commissioner by filing suit in the United States District Court for the Eastern District of New York.  (See Compl.)  On March 21, 2024, Plaintiff moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (ECF No. 8.)  That same day, the Commissioner cross-moved for judgment on the pleadings.  (ECF No. 9.)  In connection with the motions, Plaintiff also submitted a reply brief (ECF No. 10), and the parties also filed the administrative transcript.  (ECF No. 11.)

## A.    **Plaintiff's Alleged Impairments**

Plaintiff Robert Silverman Oliveras was born in 1993 and was 23 years old at the time of his June 2016 social security benefits application.  (Tr. 28, 130).  At the hearing in October 2018, Plaintiff reported that he had not worked on a full-time basis since June 3, 2016, after he was

diagnosed with Hodgkin's lymphoma and became very depressed and anxious.[1]  (Tr. 33.)  Plaintiff also reported having trouble with his short-term memory due to his medications, which have included valium and oxycodone.  (Tr. 29-30, 33.)  In his July 2016 Function Report, Plaintiff indicated that he lived with his family and had no trouble caring for his personal needs and needed no reminders to do so or to take his medication.  (Tr. 169-71.)  Plaintiff went outside every day, drove, used public transportation, and grocery shopped.  (Tr. 172.)  Plaintiff was able to manage his finances and spent his time watching television and playing video games.  (Tr. 173.)  Plaintiff also socialized two to three times per week.  (Tr. 173.)  Plaintiff reported no problems paying attention or finishing what he started and noted that he could follow spoken and written instructions.  (Tr. 175-76.)  Plaintiff indicated that he had bad anxiety due to illness and it caused fear, rapid heart rate, and paranoia.  (Tr. 176.)

At the time of the hearing in October 2018, Plaintiff was 25 years old and had completed high school and some college education.  (Tr. 28.)  Plaintiff testified that he was not working and that he had last worked in 2017.  (Tr. 28-29.)  Plaintiff had worked full-time as a telecommunications cable installer for a cable company but stopped after he was diagnosed with stage four Hodgkin's lymphoma in June 2016.  (Tr. 29, 35.)  Plaintiff received chemotherapy treatment at Memorial Sloan Kettering until he went into remission in September 2016.  (Tr. 32.)  Plaintiff continued to meet with his oncologist every three months.  (Tr. 32.)  In 2017, Plaintiff tried to work; however, he stopped after three months because he was taking Valium and Oxycodone and was "under the influence 24 hours a day."  (Tr. 29-31.)

Plaintiff also testified that he continued to see a psychologist at Sloan Kettering because he became "very depressed" and suicidal after his cancer diagnosis, his mother's cancer diagnosis,

---

[1] The parties previously agreed that claimant's cancer diagnosis does not constitute a severe impairment that lasted for twelve consecutive months.  (Tr. 349, 464.)

and the death of his grandparents.  (Tr. 32-33.)  Plaintiff explained that his psychiatrist prescribed "heavy medication" rendering him is unable to drive and causing short-term memory difficulties. (Tr. 33-34.)  Plaintiff testified that he has "very few" friends. (Id.)  However, since March 2018, he had been able to work and had been "continuously been looking for a job," even though he was "scared to go back[.]" (Tr. 33.)

On remand, Plaintiff appeared at a hearing before the ALJ in February 2022 and testified that he had owned a novelty gift shop since 2018, but that his mother ran the shop and he only stopped by for about three hours each week to make sure it was running properly.  (Tr. 376.) Plaintiff's girlfriend drove him to the shop.  (Tr. 377.)  Plaintiff testified that he could not deal with the public and developed anxiety and stress when he was at the shop. (Tr. 377.)  Plaintiff further testified that he was unable to work due to his psychiatric issues.  (Tr. 377-78.)  At a subsequent hearing in February 2023, Plaintiff reported that he had been working as a flagger at construction sites since the prior month.  (Tr. 416.)

**B.  <u>Medical Evidence</u>**

Plaintiff was diagnosed with Hodgkin's lymphoma in June 2016.  (Tr. 229-31, 264.)  By letter dated, June 13, 2016, Ariela Noy, M.D., from Memorial Sloan Kettering Cancer Center wrote that Plaintiff was to be treated over six months for lymphoma and needed an additional three months for recovery.  (Tr. 229.)  She requested that Plaintiff be excused from work.  (Tr. 229.)

On July 14, 2016, Plaintiff visited psychiatrist Jeffrey Freedman, M.D., at Memorial Sloan Kettering with complaints of chemotherapy side effects.  (Tr. 325.)  A mental status evaluation reflected that Plaintiff had good insight and judgment, he was well-oriented, and his attention span and memory were intact.  (Tr. 326.) Plaintiff's mood was anxious, his thought process was logical, coherent, goal directed, and organized, and Dr. Freedman noted that he was "clearly traumatized

4

by" his diagnosis. (Id.) Dr. Freedman diagnosed Plaintiff with "adjustment disorder with anxiety" and assessed his anxiety as "related to dealing with cancer." (Id.)

On August 10, 2016, following two cycles of chemotherapy, a PET scan revealed no evidence of active cancer. (Tr. 244-49, 266-67, 270, 301-02.) On August 15, 2016, Plaintiff saw Dr. Noy who rated his stress level as a 9.5 out of 10. (Tr. 265, 300.) Dr. Noy noted that Plaintiff's medical history included adjustment disorder with anxiety, from May through June 2016. (Tr. 265, 300.) Upon examination, Dr. Noy noted that Plaintiff's mood and affect were normal and that Plaintiff should continue supportive oncology care with Dr. Freedman. (Tr. 266, 270, 301, 305.) Dr. Noy observed that Plaintiff "seemed a bit relieved today with outcome of PET scan." (Tr. 270, 305.)

On August 18, 2016, Plaintiff saw Dr. Freedman and reported that he was pleased with the results of his cancer treatment, but remained worried about recurrence. (Tr. 297-98.) Dr. Freedman observed that Plaintiff's mood was euthymic and opined that "[a]nxiety may decrease based on excellent news received about PET scan." (Tr. 298.) He noted that Plaintiff's thought process was logical, coherent, goal directed, and organized, his memory and attention span were intact, and his insight and judgment were good. (Tr. 298.) Dr. Freedman advised Plaintiff to continue taking Klonopin, medication for anxiety. (Tr. 298.)

Plaintiff continued chemotherapy, (Tr. 291), but on August 29, 2016, nurses could not secure a peripheral IV for the medication; thus, they planned to place a peripherally inserted central catheter ("PICC") line to administer the medication to Plaintiff. (Tr. 291, 295.) On September 2, 2016, a PICC line was inserted in Plaintiff's left arm. (Tr. 333.) The same day, Plaintiff called Dr. Freedman and reported increased anxiety related to the PICC line and raised concerns that he would run out of Klonopin over the weekend. (Tr. 290.) Dr. Freedman renewed Plaintiff's prescription and noted that they would address the anxiety at their next meeting. (Id.)

On September 13, 2016, Plaintiff saw Dr. Freedman and discussed his increased anxiety related to the PICC line. (Tr. 286.) Plaintiff reported that his anxiety was not as well controlled with Klonopin and wondered if Valium would help. (Tr. 286.) Dr. Freedman recommended Lexapro and noted that "[f]inances is another stressor and he is in the process of applying for disability." (Tr. 286.) Dr. Freedman noted that Plaintiff had good insight and fair judgment, his mood was anxious, his attention span was intact, and his thought process was logical, coherent, goal directed, and organized. (Tr. 286-87.) Dr. Freedman also noted that Plaintiff's memory was intact and that he was well-oriented. (Id.)

On September 14, 2016, Plaintiff saw Dr. Noy for a fourth chemotherapy cycle. (Tr. 277.) Plaintiff reported high stress, (Tr. 278), and Dr. Noy noted that Plaintiff should continue supportive care with Dr. Freedman. (Tr. 284.) On September 27, 2016, Plaintiff saw Dr. Freedman for a fourth session. (Tr. 275-76.) Dr. Freedman noted that Plaintiff had tolerated Lexapro for two weeks without side effects. (Tr. 275.) Plaintiff reported that he did not feel a "clear benefit" from the medication and Dr. Freedman explained it may take at least six to eight weeks to "work." (Tr. 275.) Plaintiff reported feeling "irritable at home and seem[ed] to displace anxiety on relatively trivial things." (Tr. 275.) Dr. Freedman noted that Plaintiff had good insight and fair judgment, his mood was anxious, his attention span was intact, and his thought process was logical, coherent, goal directed, and organized. (Tr. 276.) Dr. Freedman also noted that Plaintiff's memory was intact and that he was well-oriented. (Id.) Dr. Freedman continued his diagnosis of adjustment disorders with anxiety "related to dealing with cancer." (Id.)

In a medical source statement dated September 20, 2018, Dr. Freedman opined that from May 2016 through March 2018, Plaintiff had poor or no ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses,

function independently and/or maintain attention or concentration due to his severe anxiety. (Tr. 339-40.) Dr. Freedman further opined that Plaintiff had poor or no ability to understand, remember and carry out job instructions, behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. (Tr. 340.) In addition, Dr. Freedman opined that anxiety affected Plaintiff's ability to drive and maintain a regular work schedule. (Tr. 340.)

After reviewing the evidence in the record at the time, State agency psychiatric consultant E. Selesner, M.D., opined on October 12, 2016, that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 47.) Dr. Selesner further found that Plaintiff was capable of following supervision and relating appropriately to co-workers, as well as sustaining attention and responding to changes in the work setting. (Tr. 51.)

There is a gap in Plaintiff's treatment records until February 2019, when Plaintiff was seen by William Blau, M.D., following a syncopal event. (Tr. 803.) Dr. Blau noted that Plaintiff's last oncology evaluation six months earlier revealed no recurrence. (Id.) Plaintiff reported that he had been taking Valium since being diagnosed with anxiety, and he had been feeling well until the prior Friday when he had a seizure, passed out, and bit his tongue. (Id.) Testing showed normal EKG tracing, and Dr. Blau's examination findings were unremarkable. (Id.) Records from March 12, 2019 indicate that Plaintiff was seen for follow up of his lymphoma and reported that Dr. Freedman would no longer renew his Valium prescription due to poor follow-up and that he was told that he must find a new psychiatrist. (Tr. 356, 996.)

In March 2019, Plaintiff visited Joseph Weaver, a psychiatric mental health nurse Practitioner ("PMHNP"), of Nassau Psychiatric Services ("Nassau Psychiatric") with complaints

of panic attacks and agitation, with the last panic attack occurring a day earlier. (Tr. 923.) Plaintiff reported that he was taking Valium but had been unable to make a psychiatry appointment for three months and was running out of the medication; when he tried to wean himself from the Valium, he experienced a seizure. (Tr. 923.) On mental status examination, Plaintiff was alert, oriented, and had an anxious mood with congruent affect; his speech was fluent and spontaneous and thought processes were linear and goal-oriented; he had no suicidal or homicidal ideation, or hallucinations; his memory, attention, and concentration were intact; and he had good judgment and insight. (Tr. 924.) Mr. Weaver recommended switching from Valium to Klonopin. (Tr. 926.) Plaintiff subsequently switched to Klonopin. (Tr. 921.) By May, Plaintiff reported feeling "a bit better," (Tr. 913), and by his June appointment, Plaintiff told Mr. Weaver that he was doing well with very few panic symptoms over the prior few months. (Tr. 910.)

Mr. Weaver documented unremarkable mental status examination findings for both appointments with Plaintiff, including fluent speech, goal-oriented and linear thought processes, full orientation, intact memory and attention/concentration, fair judgment and insight, and a good mood. (Tr. 910-11, 914-15.) Plaintiff continued to visit Mr. Weaver monthly and by September 2019, Mr. Weaver noted:

> The patient's affective and emotional state appeared generally positive and functioning appeared to be very good with minimal difficulties and is able to cope well in most areas of life (e.g., relationships, work/school, and leisure). The patient is quite content and reports only everyday difficulties and concerns. The patient's overall level of mental and emotional functioning suggests no difficulty and/or impairment.

(Tr. 898.) More specifically, Ms. Weaver wrote that Plaintiff had:

> mild difficulty with social interaction and interpersonal relationships. The patient has no difficulty engaging in and maintaining day-to-day functioning at work, school and/or in the household. The patient has mild impairment in the ability to engage in social, family, and community functions and obligations.

8

(Tr. 898.) Mr. Weaver's examination findings remained unchanged at Plaintiff's October, November, and December appointments, with notes indicating that Plaintiff was doing well and his mood had been good. (Tr. 882-83, 885-87, 890-92.)

In February 2020, Plaintiff visited Martha Alzamora, M.D., of Nassau Psychiatric, with complaints of anxiety, panic attacks, and benzodiazepine dependence. (Tr. 877.) Plaintiff indicated that he was working for Amazon and managing a medical marijuana and CBD business; six months earlier he had applied for a job with a customs agency, but he needed to taper off benzodiazepines to continue with the job application. (Tr. 877.) Plaintiff also reported having a seizure the prior year related to possible benzodiazepine withdrawal. (Tr. 877.) On mental status examination, Dr. Alzamora found that Plaintiff was alert, made good eye contact, and had normal speech (Tr. 877.) Plaintiff's treatment records indicate that he had an anxious mood and affect; intact logical and goal-directed thought processes; intact memory, attention, and concentration; no delusions or hallucinations; limited insight; and fair judgment and impulse control. (Tr. 877-78.) Plaintiff continued to visit Dr. Alzamora monthly, and by April she documented a euthymic mood, good insight, good judgment, and good impulse control. (Tr. 872-73.) At his July appointment, Dr. Alzamora observed that Plaintiff was doing well weaning off of benzodiazepines, and although anxiety was still present, he was not willing to try any new psychotropic medications at that time. (Tr. 866.) Mental status examination findings were unchanged from earlier visits. (Tr. 866.)

In August 2020, Plaintiff began seeing Danielle Hearne, PMHNP, under Dr. Alzamora's Supervision. (Tr. 863, 865.) Ms. Hearne's mental status examination findings were generally unremarkable, including a full-range affect and euthymic mood, logical and goal-directed thought processes devoid of delusion or hallucination, intact memory, intact concentration and attention, and good insight and judgment; she continued the plan for a slow taper from benzodiazepines. (Tr. 863-64.) Plaintiff related that his anxiety level was consistently high and slept only two to three

9

hours per night. (Tr. 863.) But Plaintiff was not agreeable to other psychotropic medications or psychotherapy as treatment options. (Tr. 863-64.) Plaintiff visited Ms. Hearne throughout the remainder of 2020 and into 2021 to manage his slow taper from benzodiazepines, (Tr. 845-46, 848-49, 851-52, 854-55, 857-58, 860-61), and by March 2021, he believed his anxiety level was manageable.[2] (Tr. 843.)

Ms. Hearne also noted that during this time period, Plaintiff used medical marijuana daily. (Tr. 845, 848, 851, 854, 857, 860.) By May 2021, Plaintiff reported that he was smoking marijuana "pretty much all day," but he continued to indicate that his anxiety level was manageable. (Tr. 836-837.) Although he continued to feel very stressed on most days, he was overwhelmed by work demands and his business, which was not currently successful. (Tr. 836.) He was not engaged in psychotherapy, never had been, and was not interested in engaging in it, despite strong recommendations to do so. (Tr. 358, 836). Plaintiff continued seeing Ms. Hearne through the remainder of the year, during which time clinical findings remained unremarkable, (Tr. 931-32, 934-35, 937-38, 940-41, 943-44, 1142-43), and by December, he reported that he had successfully completed a full month without benzodiazepines. (Tr. 1139.)

Plaintiff met with John Miller, Ph.D., in July 2022 for a consultative psychiatric evaluation. (Tr. 1399.) He reported not currently working because he had received no job offers and previously closing his store because it was not profitable. (Tr. 1399.) Plaintiff reported waking up 4-5 times a night because of anxiety and night terrors, weight loss of 120 pounds over the past two years, recurring depressive episodes, dysphoric moods and occasional diminished sense of pleasure. (Id.) Plaintiff reported activities of daily living including handling his personal care, cooking, cleaning, and socializing with friends and family. (Tr. 1401.) On mental status examination, Dr. Miller

---

[2] Separately, in January of 2021, Plaintiff reportedly underwent right hip surgery to repair torn labrum and bone spurs after a motor vehicle accident. (Tr. 1091.)

found that Plaintiff was appropriately dressed and well-groomed with normal motor behavior, appropriate eye contact, clear and fluent speech, and an anxious mood and affect. (Tr. 1400.) He exhibited coherent and goal-directed thought process, intact attention and concentration, intact recent and remote memory, and good insight and judgment. (Tr. 1400-01.) Dr. Miller opined that Plaintiff would be mildly limited in understanding and applying complex directions, interacting appropriately with others, sustaining concentration, and sustaining an ordinary routine and regular attendance at work; and moderately limited in regulating emotion, controlling behavior, and maintaining well-being. (Tr. 1401.)

Medical expert Ira Hymoff, Ph.D., testified at the hearing on February 14, 2023, noting a diagnosis of anxiety disorder with mild to moderate limitations that did not meet or equal the criteria of a listed impairment. (Tr. 421, 423-24.) Dr. Hymoff opined that Plaintiff had moderate limitations in his abilities to understand, remember, or apply information based on side effects of his medications; interact with others based on interpersonal difficulties and social discomfort; concentrate, persist, or maintain pace based on panic and anxiety impacting concentration; and had some issues adapting and managing himself. (Tr. 424-30.) He testified that Plaintiff's anxiety was mostly managed with medication and medical marijuana with some symptoms despite compliance with treatment. (Tr. 423-30.) He further opined that Plaintiff could perform simple routine tasks; make simple work-related decisions; occasionally interact with supervisors, coworkers, and the public; and tolerate occasional or modest changes in work expectation; but could not perform work requiring timed production standards. (Tr. 424-30.)

## C.    **ALJ Weiss's Decision**

ALJ Weiss issued his decision on February 18, 2023. (Tr. 343-369.) He applied the five-step process described below, pursuant to 20 C.F.R. § 404.1520. (Id.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 6, 2016, the social security

11

benefits application date.  (Tr. 349.)  At step two, the ALJ found that Plaintiff had the severe impairments of anxiety disorder and degenerative joint disease of the right hip.  (Tr. 349-50.)  At step three, the ALJ found that these impairments did not satisfy the criteria of a listed impairment. (Tr. 350-54.)  Then, the ALJ found that Plaintiff retained the RFC to perform:

> sedentary work as defined in 20 CFR 416.967(a) except [Plaintiff] can lift/carry/push/pull 10 pounds occasionally and less than 10 pounds frequently; sit for 6 hours and stand/walk for 2 hours in an eight-hour workday; and cannot be exposed to excessive dust or work in a dirty environment. In addition, [Plaintiff] can perform simple, routine tasks; use judgement to perform simple work-related decisions; occasionally interact with coworkers, supervisors, and the public; and can perform work that does not require time production standards such as an assembly line; and can tolerate occasional changes in work expectations.

(Tr. 354.)  At step four, the ALJ found that Plaintiff did not have past relevant work.  (Tr. 361.)  At step five, the ALJ considered the testimony of a vocational expert and found that, given Plaintiff's RFC and vocational profile (age, education, and work experience), he could perform work that exists in significant numbers in the national economy, including in representative occupations as an addresser and escort vehicle driver.  (Tr. 361-62.)  Accordingly, the ALJ found that Plaintiff was not disabled from June 6, 2016, through the date of the decision.  (Tr. 362.)

## II.    LEGAL STANDARDS

### A.    <u>Social Security Disability Standard</u>

To qualify for disability benefits under Title XVI, an individual must be (i) insured for disability benefits; (ii) not have attained retirement age; (iii) be a U.S. citizen or a foreign national under certain circumstances not relevant here; and (iv) have a "disability."  42 U.S.C. § 423(a)(1). The SSA defines "disability" to mean that an individual cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  Additionally, the impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated implementing regulations prescribing a five-step analysis for ALJs to follow to determine if a claimant is eligible for disability benefits. See 20 C.F.R. § 404.1520. The Second Circuit summarizes that analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant can perform.'

Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Bushey v. Berryhill, 739 F. App'x 668, 671 (2d Cir. 2018) (similar). The claimant bears the burden of proof at steps one through four, and then the burden shifts to the Commissioner at step five to demonstrate that claimant is capable of work. Talavera, 697 F.3d 145 at 152; Williams v. Comm'r of Soc. Sec., No. 20-CV-02665, 2021 WL 4690794, at *1 (E.D.N.Y. Oct. 7, 2021) ("the claimant bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step.") (internal citation omitted).

## B.    Standard of Review

"The Court's review of a Commissioner's denial of disability insurance benefits is limited to two inquiries: (1) whether the Commissioner applied the correct legal standards in reaching a decision, and (2) whether the Commissioner's factual findings were 'supported by substantial evidence in the record as a whole.'" Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015)). "The

13

Court will not, however, substitute its own judgement for that of the Commissioner's 'or determine de novo whether [the claimant] is disabled.'" Id., 516 F. Supp. 3d at 220 (quoting Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012)); see also Greek, 802 F.3d at 374-75 ("The disability within the meaning of the Act belongs to the Commissioner.").

Regarding the first inquiry, the Court must determine whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted); accord Zacharopoulos v. Saul, 516 F. Supp. 3d 211, 220 (E.D.N.Y. 2021). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." Edwards v. Comm'r of Soc. Sec. Admin., No. 22-CV-4345, 2023 WL 6173526, at *2 (S.D.N.Y. Sept. 22, 2023) (quoting Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008)).

Inquiry into whether the Commissioner's factual findings are supported by substantial evidence requires the reviewing court to "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotation marks and citation omitted)). "Substantial evidence" is "more than a mere scintilla." Ryan on Behalf of V.D.C. v. Comm'r of Soc. Sec., No. 21-2947-CV, 2022 WL 17933217, at *1 (2d Cir. 2022) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). The findings of the Commissioner as to any fact though, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). Thus, the relevant question is not whether substantial evidence supports Plaintiff's position, but whether "substantial evidence supports *the ALJ's decision*." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original). This is a "highly deferential standard of review." Spellman v. Comm'r of

14

Soc. Sec., No. 21-CV-05842, 2023 WL 5350845, at *9 (E.D.N.Y. Aug. 21, 2023) (citing Negron

v. Berryhill, 733 F. App'x 1, 2 (2d Cir. 2018)).

## III.    DISCUSSION

### A.    Standards for Reviewing the ALJ's RFC Determination

In deciding a disability claim, an ALJ must "weigh all of the evidence available to make

an [Residual Functional Capacity] ["RFC"] finding that [is] consistent with the record as a whole."

Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013).  The RFC determination represents "the most

[a claimant] can still do despite [the claimant's] limitations."  Barry v. Colvin, 606 F. App'x 621,

622 n.1 (2d Cir. 2015); see also Crocco v. Berryhill, 2017 WL 1097082, at *15 (E.D.N.Y. Mar.

23, 2017) (stating "an RFC determination indicates the 'nature and extent' of a claimant's physical

limitations and capacity for work activity on a regular and continuing basis") (quoting 20 C.F.R.

§ 404.1545(b)).  The Court must uphold this determination when it is supported by substantial

evidence.  See 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive"); Alvarez v. Comm'r of Soc.

Sec., No. 20-CV-03963, 2023 WL 2464961, at *1 (E.D.N.Y. Mar. 10, 2023) (same).

The "treating physician rule" provides that the medical opinions and reports of Plaintiff's

treating physicians are to be given "special evidentiary weight."  Clark v. Comm'r of Soc. Sec.,

143 F.3d 115, 118 (2d Cir. 1998); see 20 C.F.R. § 404.1527(c)(2).[3]  However, the opinion of a

treating physician "need not be given controlling weight where [it is] contradicted by other

substantial evidence in the record."  Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2

(S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted).

---

[3] "[T]he Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect."  Williams v. Colvin, No. 16-CV-2293, 2017 WL 3701480, at *1 (E.D.N.Y. Aug. 25, 2017); see also 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

When an ALJ does not afford controlling weight to the opinion of a treating physician, the ALJ must consider several factors: "(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). The Second Circuit has distilled these down into the four "*Burgess*" factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (citing Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(2))). The ALJ must "explicitly consider" the *Burgess* factors when assigning less-than-controlling weight to a treating source opinion; if not, the Court will conduct "a searching review of the record" and will affirm where "the substance of the treating physician rule was not traversed." Estrella v. Berryhill, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

The ALJ must also set forth "'good reasons' for not crediting the opinion of a [plaintiff's] treating physician." Id. at 287. An ALJ provides "'good reasons' for discounting a treating physician's opinion if they reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician rule, he nonetheless stated that [the physician's] opinion ... was contradictory to the rest of the record evidence.").

**B.    Substantial Evidence Supports the ALJ's RFC Determination**

Plaintiff contends that the ALJ erred when he did not give controlling weight to the opinion from treating psychiatrist Dr. Freedman.  (See ECF No. 8 at 14-18.)  Plaintiff asserts that while ALJ Weiss assigned Dr. Freedman's opinion "some weight," he failed to provide "good reasons" for giving Dr. Freedman's opinions less than controlling weight.  (Id. at 16.)  Specifically, Plaintiff argues that ALJ Weiss appears to have based his RFC determination solely on the opinion of non-treating and non-examining medical expert Dr. Hymoff, without giving adequate consideration to the fact that Dr. Freedman was a psychiatrist who treated Plaintiff monthly for several years.  (Id. at 17.)  Plaintiff further argues that ALJ Weiss did not address whether Dr. Freedman's opinion was supported by medically acceptable clinical and laboratory diagnostic techniques or was inconsistent with other substantial evidence in the record.  (Id.)  Plaintiff asserts that this purported failure constitutes prejudicial error and thus requires a remand to the Commissioner for further proceedings.  (ECF No. 8 at 18.)

Plaintiff's arguments, however, are not supported by the record, and ALJ Weiss's decision is based on substantial evidence.  It is within the ALJ's discretion to resolve genuine conflicts in the evidence when formulating the RFC finding.  See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); see also Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence.").  To that end, an ALJ has the purview to reject those portions of a medical opinion that are inconsistent with or contrary to the evidence of record, while accepting those portions that are supported by the record evidence.  See Veino, 312 F.3d at 588.  The Court finds that ALJ Weiss carefully reviewed the record and complied with all regulations in rendering his decision.

The ALJ concluded that Dr. Freedman's opinion was not entitled to controlling weight because it was not supported by his own objective clinical examinations that documented largely

unremarkable findings, including euthymic mood with a full range affect, a logical and coherent thought process, intact memory and attention span, good insight and judgment, and an absence of delusions or hallucinations. (Tr. 360; see Tr. 276, 287-88, 298, 326-27); see 20 C.F.R. § 416.927(c)(1), (3). The ALJ further noted that Dr. Freedman's treating notes did not document any issues interacting or controlling emotion. (Tr. 360; see Tr. 276, 286-87, 298, 325-26.) The ALJ also explained that Dr. Freedman's medical opinion noting extreme limitations was inconsistent with the clinical findings from multiple other treatment providers who treated and evaluated Plaintiff. (Tr. 360, citing Tr. 830-928, 931-45, 947-1077, 1134-44, 1399-1402). While Plaintiff reported anxiety at times as he weaned of benzodiazepines, clinical findings were unremarkable beyond an occasional anxious mood or affect. (Tr. 360, citing various parts of the administrative transcript); see 20 C.F.R. § 416.927(c)(4).

Plaintiff contends that the ALJ committed error by failing to mention that Dr. Freedman was Plaintiff's treating psychiatrist "for several years," (ECF No. 8 at 17), but the ALJ expressly acknowledged the length of the treating relationship as documented in the record. (Tr. 355, 360.) Specifically, the ALJ noted that Plaintiff began treating with Dr. Freedman shortly after he was diagnosed with Hodgkin's lymphoma, around July 2016, and continued treatment until September 2016. (Tr. 355, citing Tr. 235; Tr. 360.) Therefore, the record before the ALJ reflects that Plaintiff treated with Dr. Freedman for a period of approximately three months. See 20 C.F.R. § 416.1527(c)(2) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). While Plaintiff suggests that he treated with Dr. Freedman "for several years," there

were no records before the ALJ to support this allegation, as Dr. Freedman's treatment notes document four meetings with Plaintiff between July 14, 2016 and September 27, 2016.[4]

The Court finds that the ALJ did not err in according less weight to Dr. Freedman's opinion, because the ALJ explained that it was not supported by Dr. Freedman's own treatment notes reflecting mostly normal examinations and effective management of symptoms with medication. The Court recognizes that Dr. Freedman diagnosed Plaintiff with anxiety and related mental issues, but his notes reflect that Plaintiff was able to function despite these issues. Thus, Dr. Freedman's opinion stating that Plaintiff had severe, significant limitations is not in harmony with his own treatment notations. See Monroe v. Comm'r of Soc. Sec., 676 F. App'x 5, 8 (2d Cir. 2017) ("the ALJ [properly] rejected [the treating physician's] opinion because she found it was contrary to his own treatment notes" and "[w]hile [the] medical source statement is supported by some evidence, the ALJ's decision to disregard [the] opinion is nevertheless substantially supported by the record."). Notably, in Monroe, the ALJ did not afford controlling weight to the claimant's psychiatrist even where he treated the claimant with counseling and medication for anxiety and depression for over fifteen years. Monroe v. Comm'r of Soc. Sec., No. 14-CV-1035, 2015 WL 13744412, at *2-3 (N.D.N.Y. Nov. 3, 2015), report and recommendation adopted, 2016 WL 552364, aff'd 676 F. App'x 5.

While Plaintiff argues that the only evidence supporting the ALJ's RFC assessment was the opinion from non-examining source Dr. Hymoff, the ALJ's RFC finding was properly based on an evaluation of the full record—including clinical findings from other treatment providers, the nature of Plaintiff's treatment, and Plaintiff's reports of his own activities—not merely medical

---

[4] In support of Plaintiff's claim that he treated with Dr. Freedman for "several years,", Plaintiff cites to Tr. 454, the prior district court decision remanding the case. This decision does not state that Plaintiff treated with Dr. Freedman for years. Instead, it notes that the earliest available treatment record from Dr. Freedman was July 14, 2016, though it appears that Plaintiff may have begun treatment prior to that date, although no earlier than June 2016. (Tr. 454); see Oliveras v. Comm'r of Soc. Sec., No. 19-CV-6462, 2021 WL 965155, at *8 (E.D.N.Y. Mar. 15, 2021). There is nothing in the record establishing that Plaintiff's visits with Dr. Freedman continued beyond September 2016.

source opinions (Tr. 354-60). The ALJ acknowledged that Plaintiff was treated at Nassau Psychiatric Services from 2019 through 2021, with treatment records documenting largely normal exams with findings of intact memory, attention, concentration, thought process and content, as well as largely good insight, judgment, and impulse control. (Tr. 357.) While there were also some reports of anxiety and stressed mood, Plaintiff's mental status was generally unremarkable and unchanged, with medical notes indicating that treatment was successful. (Id., citing Tr. 836-917.) And the ALJ recognized that although Plaintiff reported anxiety during this time, Plaintiff also indicated that it was manageable and did not want to try any other psychotropic medications or counseling. (Tr. 354-60.) Such evidence supports the ALJ's finding that, while Plaintiff had some degree of limitation from his mental impairment, it did not preclude him from performing unskilled work.

In addition to the evidence showing benign clinical findings and conservative treatment, the ALJ found that consultative examiner Dr. Miller's opinion was entitled to good weight. (Tr. 359-60). After examining Plaintiff and documenting unremarkable mental status findings, Dr. Miller opined that Plaintiff had some moderate limitations in regulating emotion, controlling behavior, and maintaining well-being as well as some mild limitations in interacting with others, sustaining concentration, performing at a consistent pace, and sustaining an ordinary routine and attendance. (Tr. 359, citing Tr. 1399-1402.) The ALJ also gave good weight to the opinion from expert psychologist Dr. Hymoff, who testified that Plaintiff could perform simple, routine work, make simple work-related decisions, occasionally interact with others, tolerate occasional changes in workplace expectations, and could not perform production pace work. (Tr. 359; see Tr. 421-32). Notably, Dr. Hymoff rendered this opinion after reviewing the full record before the ALJ. (Tr. 421.) Thus, in assessing Plaintiff's RFC, the ALJ considered the full record and weighed the relevant evidence, including the consultative exam of Dr. Miller and the expert

20

opinion of Dr. Hymoff.  Contrary to Plaintiff's argument, the ALJ did not simply substitute his own lay interpretation for that of a medical expert in his assessment of the RFC.  See Heath v. Barnhart, No. 04-CV-2926, 2005 WL 1691044, at *5 (E.D.N.Y. July 20, 2005) ("Rather than substituting his own medical opinion for that of [the treating physician], the ALJ simply chose to credit the opinions of two medical experts who found no medical evidence to support the pain of which [Plaintiff] complained, and whose opinions were therefore at odds with [the treating physician's.")

After carefully considering the entire record and the ALJ's opinion, the Court finds that the ALJ applied the substance of the treating physician rule.  The Court therefore concludes that ALJ Weiss's RFC determination is supported by substantial evidence and must be upheld.  See 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); Alvarez, 2023 WL 2464961, at *1 (E.D.N.Y. Mar. 10, 2023) (same).

## C.    Substantial Evidence Supports the ALJ's Step-Five Finding

Plaintiff also argues that ALJ Weiss improperly relied on the testimony of a vocational expert in determining which jobs Plaintiff could perform because the Dictionary of Occupational Titles ("DOT")'s description of these jobs is outdated and ALJ Weiss did not adequately inquire into whether these jobs exist in substantial numbers in the modern economy.  (See ECF No. 8 at 18-20.)  The ALJ acknowledged that Plaintiff could not perform a full range of sedentary work due to additional non-exertional limitations, and the ALJ obtained vocational expert testimony to determine the effect of Plaintiff's limitations on the unskilled occupational base. (Tr. 433-34.)  The vocational expert testified that an individual with Plaintiff's vocational factors and RFC could perform such representative occupations as addresser, with 2,000 jobs available, and escort driver, with 30,000 jobs available.  (Tr. 433-34.)  Plaintiff argues that the DOT job descriptions for both

of these jobs are outdated such that they no longer exist in significant numbers in the economy. (ECF No. 8 at 19.)  In support of this argument, Plaintiff cites case law in and out of this Circuit noting that the addresser position is obsolete or "no longer exists as an isolated role, at least not in significant numbers."  (Id.); see Hawthorne v. Comm'r of Soc. Sec., No. 20-CV-02247, 2021 WL 4356009, at *2 (E.D.N.Y. Sept. 24, 2021).

Plaintiff's argument is unavailing, as the ALJ is entitled to give credit to vocational expert testimony "on the basis of the expert's professional experience and clinical judgement . . . which was not undermined by any evidence in the record."  McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014).  Plaintiff did not challenge the vocational expert's assessment at the administrative hearing, and Plaintiff has not otherwise alleged that there was any evidence in the record to contradict the vocational expert's assessment.

Neither the SSA nor the Commissioner regulations "provide a definition for a 'significant' number of jobs."  Dianne H. v. Kijakazi, 21-CV-06235, 2022 WL 17251583, at *7 (S.D.N.Y. Nov. 28, 2022) (citation omitted).  However, Courts have generally found the "significant number" threshold is "fairly minimal" and the quantity of each individual type of job may be aggregated for these purposes.  Id. (quoting Hamilton v. Comm'r of Soc. Sec., 105 F. Supp. 3d 223, 229-30 (N.D.N.Y. 2015)).  Courts in this Circuit have held that national numbers above 9,000 are "significant."  Dianne H., 2022 WL 17251583, at *8 ("[A] total number over 17,000 is sufficient to satisfy the Commissioner's step five burden."); see also Mota v. Comm'r of Soc. Sec., No. 20-CV-07294, 2022 WL 464098, at *12 (S.D.N.Y. Feb. 15, 2022) (finding a total number of 9,600 jobs was significant); Gray v. Colvin, No. 12-CV-6485, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (finding that 16,000 jobs is significant).

At a minimum, substantial evidence supports the ALJ's finding that Plaintiff can perform the escort driver position.  There exists a significant number of jobs in the national economy for

the escort driver position—30,000—to support the ALJ's step-five finding.  See 20 C.F.R. § 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his] physical or mental abilities and vocational qualifications."); Bavaro v. Astrue, 413 F. App'x 382, 384 (2d Cir. 2011) (citing 20 C.F.R. § 404.1566(b) and explaining that the Commissioner "need show only one job existing in the national economy" that the claimant can perform); Brennan v. Colvin, No. 14-CV-3165, 2016 WL 236227, at *5 (E.D.N.Y. Jan. 19, 2016) ("As the regulation notes, a finding of plaintiff's ability to perform even one occupation can be enough to satisfy the requirement that a significant number of jobs exist in the national economy."); Lamont v. Comm'r of Soc. Sec., No. 20-CV-4581, 2021 WL 5084060 (E.D.N.Y. Nov. 2, 2021) (recognizing the regulations require identification of only one job).

Thus, the Court finds that the ALJ properly relied upon the vocational expert testimony and that the ALJ's determination at step five is supported by substantial evidence.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment on the pleadings and GRANTS the Commissioner's cross-motion.  The Clerk of The Court is respectfully directed to enter judgment accordingly and close this case.


**SO ORDERED.**
Dated:    February 20, 2025
          Central Islip, New York

                                        /s/ (JMA)
                              _____
                              JOAN M. AZRACK
                              UNITED STATES DISTRICT JUDGE